## No. 3812.

### (Court of Appeal, Parish of Orleans.)

## BAKER & MCDOWELL HARDWARE CO. vs. LIVERPOOL AND LONDON & GLOBE INSURANCE CO.

1. The effect of an affirmative warranty is to make void the policy if the statements made are not literally true.
2. In propounding questions to the applicant the insurer is understood to be actuated by an earnest desire to acquire such information as will enable him intelligently to decide as to the desirability of the risk and the assured is bound, morally and legally, to answer them truthfully.
3. The rule of forfeiture resulting from the falsity of a statement constituting an affirmative warranty, is not based on the theory of injury to the insurer as the result of the false statement, but is predicated of the principle that as the utmost good faith is required in insurance contracts, the assured has but fraudulently obtained the policy when he has misrepresented the facts in his answers to questions propounded to him in his application and which answers he has submitted to the assurer as the basis for desired issuance. As a penalty for his fraud the forfeiture ensures.
4. The rule of the criminal law that in a criminal charge of arson the guilt of the accused must be established beyond a reasonable doubt is relaxed in a civil action in which this defense is set up. A preponderance of evidence, as in all civil cases, is all that is necessary to establish this defense.

Appeal from Civil District Court, Division "B."

Fenner, Henderson & Fenner, for Plaintiff and Appellant.

H. H. Hall, for Defendant and Appellee.

MOORE, J. This was a suit on a policy of fire insurance, instituted by the assignees thereof, and to which the following defenses were propounded.

First. Fraudulent overvaluation of the stock of goods insured.

Second. Fraudulent misrepresentation contained in the application to the effect that the insured had, on the 1st day of August, 1901, and prior to the application, taken a detailed inventory of the stock of goods insured and that the exact value of the stock of goods at that time was $11,000.00.

Third. Violation of the Iron-Safe Clause in that the assured had not kept the said inventory in a fire proof safe and had not produced the inventory affirmed in the application to have been taken on the 1st August, 1901.

Fourth. That the assured had fraudulently set fire or caused fire to be set to the store and the contents thereof, the latter being the property covered by the policy.

Fifth. False swearing as to the value of the property destroyed.

. There was judgment for defendant rejecting plaintiff's demand and the latter appeals.

The record of evidence is quite voluminous but we carefully read it and have arisen from the task with the conviction that all the defenses have been fully sustained by the evidence.

It appears that the policy had been applied for by, and was issued to, W. H. Harvey & Co., but it subsequently developed that no such firm existed, as Harvey had no partner unless it be, as he testified, that his wife was his partner.

The property covered by the policy was a stock of goods consisting of hardware, cutlery, notions, groceries, buggies, wagons, crockery and harness. Situated in a one story frame building in the town of St. Joseph in this State. The policy is for $2000.00; it is dated Oct. 5th, 1901; it was delivered to Harvey on the 27th Oct. 1901, and on the 29th Oct. 1901 the insured property was destroyed by a fire which, originating in the "dead night" in Harvey's store, laid waste two thirds of the town of St. Joseph.

The policy was in the form of the "New York Standard," but to it was annexed, as a "rider" the usual iron safe clause. This "rider," as well as the body of the policy itself, contain the stipulation that the application of the assured, on which the insurance is based, is made a warranty by the assured and part of the policy. The application, signed by the assured, affirms that the assured had taken a *detailed* inventory of the stock of merchandise on hand, on the 1st day of August, 1901, and that the *exact* amount thereof was $11,000.00. By this application it was covenanted and agreed "that the above valuation, discriptions and survey xxx are submitted as warranties

and basis for the desired insurance; and that this (the) application shall form part of policy when issued.

The "Rider" contains, *inter alia,* the stipulation that: "The assured shall take a complete itemized inventory of stock on hand at least once in each calendar year, and unless such inventory has been taken within twelve months prior to the date of this policy, one shall be taken in detail within 30 days of issuance of this policy, or this policy shall be null and void," and also the stipulation that the failure to produce the inventories, etc.," this policy shall become null and void, and such failure shall constitute a perpetual bar, to any recovery thereon."

The statement contained in the application and which constitute an affirmative warranty, it developed after the fire, was absolutely false. No *detailed* inventory was taken on the 5th Aug., 1901, or on any day prior to the application. A rough *estimate* of the stock on hand had been made by the assured on this date and it is shown that the stock on hand then, did not exceed, if indeed it equaled, the sum of $4000 in value. It is an elementary principle of the law of insurance that the effect of an affirmative warranty is to make void the policy if the statements made are not literally true. This proposition of law is not contradicted by the appellant but the contention is, substantially, that the statements in the application to the effect that a detailed inventory had been taken on the 5th Aug., 1901, and that the exact value of the stock on hand at that date was $11,000.00 are not to be regarded, and were not intended to be regarded as warranties and therefore necessary to be literally true.

The argument is that if the statements stood alone, that is to say, if there were no other stipulations in the policy concerning the subject of inventories inconsistent with the theory that these representations were to have the effect of warranties, then the representations might be regarded as warranties upon the accuracy of which the validity of the contract would depend; but, forasmuch as the policy contains the stipulation to be found in the "rider" to the effect, that: "The assured will take a complete itemized inventory of stock on hand at least once in each calendar year, and unless such inventory has been taken within twelve calendar months prior to the date of this policy one shall be taken in de-

tail within 30 days of issuance of this policy or this policy shall be null" this clause and the representations supra resolve themself into a covenant simply to the effect that if the assured has, in point of fact, taken an inventory on the 5th Aug., 1901, then it should only be necessary to take another within a year from that date; but if it should be that no such inventory had been taken on the date stated, then an inventory must be taken within thirty days after the issuance of the policy and if not so taken then forfeiture ensues, that an inventory was taken by the assured within thirty days after the issuance of the policy and, notwithstanding the fact that none was taken on the day represented in the application, that this answers the contract and the policy may not be avoided.

This argument cannot be admitted.

The stipulations in the contract, as well as the law, affirm these representations to be warranties. The defendant company in propounding the questions to the assured: "Give date and exact amount of last inventory," "was inventory taken in detail or by estimate?" as well as in propounding all the other questions contained in the application, is understood to be actuated by an earnest desire to acquire such information as will enable it intelligently to decide as to the desirability of the risk. The assured is morally and legally bound to answer them truthfully. When answered, the questions and answers are equal to an agreement that the matter enquired about is material, and, becoming at once warranties, any misrepresentations in the answers avoids the policy.

41 A. 31, 52 A. 775; 36 A. 663; 2 La. 399; 109 La. 341; 112 La. 575.

Of course this warranty, as well as other provisions or conditions of the policy, may be waived by the insurer, if, according to the terms of the policy "such waiver, if any shall be written upon or attached hereto (to the policy). But, assuredly, the stipulation supra in the iron-safe clause does not waive this warranty nor impair or diminish its full force and effect. The evident and clear intent and meaning of that clause is the very contrary to that suggested by the appellant. It means in substance, that if the assured has not warranted that a detailed inventory has

464

been taken within twelve calendar months from the date of the policy, then the assured, under penalty of forfeiture, is bound to take one within thirty days of the issuance of the policy; if however, he has warranted that he has taken a detailed inventory within the twelve months prior to the issuance of the policy, and this should prove false, the policy is then to be null and void.

The subsequent taking of an inventory within the thirty days limit cannot avert this consequence.

The rule of forfeiture resulting from the falsity of a statement constituting an affirmative warranty is not based on the theory of injury to the assurer as resulting from the false statement, but is predicated of the principle that as the utmost good faith is required in insurance contracts, the assured has but *fraudulently* obtained the policy when he has misrepresented the facts in his answers to the questions propounded to him in the application, and which answers he has submitted to the assurer as the basis for the desired insurance. As a penalty for his fraud the forfeiture ensues.

The evidence also satisfies us that Harvey's testimony as to the value of the goods destroyed at the time of the fire was also false. Besides the policy sued on Harvey held another policy for $2000.00 in the Providence Washington Insurance Company of Providence, Rhode Island. Both policies were subject to the "three fourths value clause" so that in order to entitle the assured to recover the face value of the policies the stock of goods must have an actual value at the time of the fire of $5,233.32.

Harvey testifies that the actual cash value of the goods exceeded that amount when the fire took place. It is conclusively established that Harvey's stock at this time had been considerably reduced by the removal of a portion of it a few days before the fire to another store which he had rented in the upper part of the town. The remaining stock consisted of hardware in the proportion of about 75 or 80 per cent of the entire stock, the balance in tinware, graniteware and of goods of like character which could not be readily consumed by fire if, indeed they could have been consumed at all by that fire, as the witnesses

465

testify that a number of cans and other tinware were found untouched by the flames. Yet, it is that all the witnesses concur in the statement that having examined he debris after the fire they found so little of it that the conclusion was irristable that the stock of goods must have been a very small one, no one being willing to estimate its value at over $4000.00.

But more than all this the proof is absolutely convincing that Harvey set fire or caused fire to be set to the store. Harvey appears to have been a person of low origin and vicious instincts. He harbored, for some cause not explained, though it is intimated that it arose from jealousy at his neighbor's business success and moroseness from his own ill success. a feeeling of hatred towards his townsmen. He had repeatedly threatened that he would "get even with them if it was the last act of his life." He had started business in St. Joseph in the latter part of 1900, but it was not a prosperous one, his losses increasing from month to month and he severely bewailed his ill success to several parties several days before the fire. Some few days before the fire he had rented an other store house in an other portion of the town and some distance from the one which he was then occupying, and had transferred and removed to this new store a portion of his goods consisting of the lighter articles, such as notions, groceries, etc. On the night of the fire and some few hours preceeding that event, he had his iron safe removed from the old to the new store. He exhibited great concern in having it removed that night and expressed to the drayman who was to do the hauling, his great anxiety to have the safe removed that night.

The subject of fire seems to have been uppermost in his mind for some two or three days preceeding the fire which actually occurrd. When he rented the new store he made inquiries as to the likelihood of the new store catching fire in the event that a fire should reach a certain merchants store, a competitor of his, and whose store was two doors removed from the store which he had just rented. A short while before the fire, and on the same night, Harvey called on a Mr. Skinner, the owner of the building which Harvey was occupying, and inquired

455

of him whether he, (Skinner,) thought his (Skinner's) safe was fire proof adding that he (Harvey) did not think that it was nor was any safe in town fire proof if the town should catch fire. When the defendant's agent delivered to Harvey the policy in question on the 27th Oct., the agent stated to Harvey that as he, the agent, was going away for about three weeks he preferred that the premium should not be paid until his return. Harvey replied that this arrangement "suited him exactly and that he would pay the premium upon the agent's return."

The agent left St. Joseph on the next day. On the 29th Oct. Harvey called at the store of Joseph Moore & Co., in St. Joseph, and where he knew the insurance agent had an account and insisted on that firm receiving for the absent insurance agent the premium due on the policy, stating that he (Harvey) wanted to pay it "so that there would be no trouble in case of a fire if he paid then." It was then paid and a receipt given for it. On that night the fire occurred, or rather between midnight of that day and one or two o'clock the following morning. Harvey testifies that he was in bed and asleep in the store at the time the alarm of fire was given, and that it had made considerable head-way before, with difficulty, he was aroused, when he then rushed out of the burning building. He was seen, however, at the fire fully dressed, even to his cravat being tied and was apparently the least concerned of all who had gathered to fight the flames, and was absolutely indifferent to what was going on. He stood looking on with his hands in his pocket. His conduct aroused the fury of the people. He barely escaped personal violence at the hands of his fellow townsmen. He was arrested, tried and convicted for arson, but a new trial having been granted he was subsequently acquitted and then at once left that part of the country.

The incidents which we have recited are but a few of the many with which the record abounds, and which in our opinion, point unerringly to the fraudulent character of the fire.

The acquittal of Harvey on his second trial for arson does not affect our conviction of his guilt, for we readily appreciate the fact even if the evidence administered in the criminal trial

for arson was of like character to the evidence in the instant record, it might be that under the rule of the Criminal law that the guilt of the accused must be established beyond a reasonable doubt, an acquittal would be warranted. But the rule which requires this character of evidence to fortify conviction in a criminal charge of arson is relaxed in a civil action when this defense is set up, and it is now established by a great weight of authority, that a preponderance of evidence, as in all civil cases, is all that is necessary to establish this defense.

The judgment appealed from is not error and it is affirmed.